IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TERRI A. SHELTON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. |
| v. | : | |
| | : | |
| DITECH FINANCIAL, LLC, | : | |
| | : | _____ |
| TRANS UNION LLC | : | **JURY TRIAL DEMANDED** |
| | : | |
| EXPERIAN INFORMATION | : | |
| SOLUTIONS, INC., | : | |
| | : | |
| EQUIFAX INFORMATION | : | |
| SERVICES, LLC, | : | |
| | : | |
| Defendants. | : | |

## <u>COMPLAINT FOR DAMAGES</u>

## INTRODUCTION

1.    Plaintiff brings this action against DITECH FINANCIAL, LLC (hereinafter

"DITECH"), a furnisher of credit of information, as well as three credit

reporting agencies, Trans Union LLC (hereinafter "TRANS UNION"),

Experian Information Solutions, Inc. (hereinafter "EXPERIAN") and

Equifax Information Services, LLC, (hereinafter "EQUIFAX") for multiple

violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq., as amended* ("FCRA").

## SUBJECT MATTER JURISDICTION

2.    Subject matter jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1692k(d), 15 U.S.C. § 1681p, 28 U.S.C. §§ 1331 and 1337 (federal question jurisdiction).

3.    Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES AND PERSONAL JURISDICTION

4.    Plaintiff, Terri A. Shelton ("Shelton"), is a natural person who resides in the Atlanta Division of the Northern District of Georgia and is authorized by law to bring this action.

5.    At all times pertinent hereto, Plaintiff Shelton was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

6.    DITECH is a Delaware corporation that regularly conducts business in the State of Georgia and which has registered that its principal place of business is located at 1100 Virginia Drive, Suite 100A, Fort Washington, PA, 19034.

7.    DITECH may be served by personal service upon its registered agent in the State of Georgia, to wit: C T Corporation System, 289 S. Culver Street, Lawrenceville, GA  30046-4805.

8.    DITECH is subject to the jurisdiction and venue of this Court.

9.    Defendant Trans Union, LLC is a Delaware corporation that regularly conducts business in the State of Georgia with its principal place of business located at 555 W. Adams St., Chicago, IL 60661-3719.

10.   Trans Union may be served by personal service upon its registered agent in the State of Georgia, to wit: Prentice-Hall Corporation System, 40 Technology Pkwy South, #300, Norcross, GA 30092.

11.   Trans Union is subject to the jurisdiction and venue of this Court.

12.   Defendant Experian Information Solutions, Inc. is an Ohio corporation that regularly conducts business in the State of Georgia with its principal office place of business located at 475 Anton Boulevard, Costa Mesa, CA 92626.

13.   Experian may be served by personal service upon its registered agent in the State of Georgia, to wit: C T Corporation System, 289 S Culver St., Lawrenceville, GA 30046

14.   Experian is subject to the jurisdiction and venue of this Court.

3

15. Defendant Equifax Information Services, LLC is a Georgia limited liability company that regularly conducts business in the State of Georgia with its principal place of business located at 1550 Peachtree Street, N.W., Atlanta, GA 30309.

16. Equifax may be served by personal service upon its registered agent in the State of Georgia, to wit: Lisa Stockard, 1550 Peachtree Street, N.W., Atlanta, GA 30309.

17. Equifax is subject to the jurisdiction and venue of this Court.

18. Other defendants may be discovered during litigation, and Plaintiff respectfully prays that the Court will permit the addition of later discovered parties upon motion.

## GENERAL FACTS

19. Plaintiff obtained a purchase money home loan with Bayrock Mortgage Corporation in 2006 that was subsequently assigned to Ditech.

20. The monthly payment under the original note as assigned to Ditech was $1076.00 per month.

21. Plaintiff made all payments as scheduled from the first payment in 2006

through September of 2016.

22.  Due to financial hardship, Plaintiff made an inquiry in or about October of 2015 to Ditech about a mortgage loan modification request, and she subsequently received a trial loan modification acceptance letter from Ditech advising her to make trial payments of $1085.57 on January 1, February 1, March 1 and April 1, of 2016.

23.  Defendant DITECH's records show that Plaintiff made each of these four trial payments on December 29, 2015, February 1, 2016, March 1, 2016 and April 4, 2016.

24.  Plaintiff did not immediately receive confirmation from Ditech that she would have her trial loan modification converted to a permanent loan modification after making the last trial loan payment on April 4, 2016.

25.  Since the trial payments exceeded the amount of her original note payment by $9.57, and in an effort to be prudent, Plaintiff continued to make the higher $1085.57 monthly trial payments during the next three months of May, June and July of 2016.

26.  In early August, plaintiff was sent permanent loan modification paperwork which called for monthly payments of $1061.81 beginning on September 1,

2016.

27.     Plaintiff made regular monthly payments after the permanent loan

modification for the period from September 2016 until she sold her house in

March 2017.

28.     No payments made by Plaintiff during the temporary loan modification

period were ever more than 30 days late.

29.     No payments made by Plaintiff during the permanent loan modification

period were ever 30 or more days late.

30.     During December of 2016, plaintiff applied for a home mortgage with

Homestar Financial Corporation that was denied in part due to 90 and 120

day late payments reported by Ditech for the months of May, June and July

of 2016.

31.     Plaintiff was not late on the May, June and July of 2016 payments.

32.     The late payments for May, June and July of 2016 were reported by Ditech

to each of the credit reporting agency defendants.

33.     The late payments were also contained in the Ditech tradeline in the

Plaintiff's credit files of each of the three defendant credit reporting

agencies.

34.    The late payments were furnished to all creditors who made inquiry of her credit reports with each of the defendant credit reporting agencies.

35.    On December 19, 2016, Plaintiff sent a written dispute to Ditech about these inaccurately reported late payments along with proof of her timely payments for May, June and July of 2016.

36.    Plaintiff received a response from Ditech dated January 5, 2017 which confirms receipt of the May, June and July 2016 payments and advised her that each of the payments had been placed in "unapplied funds."  The letter goes on to state that the payments were later retroactively applied to the months of January, February and March 2016.

37.    Ditech's application of the funds received for the May, June and July 2016 payments was not per plaintiff's request or direction.

38.    Ditech's response did not make sense to Plaintiff as she had already made the January, February and March 2016 payments in full, and Ditech's retroactive misapplication of the May, June and July 2017 payments to months that had already been paid in full as part of her trial modification was a clear error.

39.    Plaintiff has called Ditech on multiple occasions and tried to correct this

clear error.

40.   Despite knowledge that she had made her payments on time and that they had themselves held the funds in an unapplied funds account and then applied them to months she had already paid in full, Ditech did not take further action to correct their record or update the credit files relating to these late payments with any of the credit reporting agencies.

41.   The misapplication of Plaintiff's May, June and July 2016 payments caused Ditech to issue an erroneous report of false payment information to each of the major credit reporting agencies about Plaintiff.

42.   Negative payment history adversely affects a consumer's credit score and the ability of consumers like Plaintiff from obtaining credit.

43.   Both 90 and 120 day late payments are considered serious delinquencies by the credit reporting industry and adversely affect credit scoring more than 30 day late payments.

44.   Plaintiff has tried unsuccessfully on several other subsequent occasions to contact Ditech by telephone to correct their erroneous reporting of late payments from May, June and July of 2016.

45.   On or about February 25, 2018, Plaintiff disputed the 90 and 120 day late

payments for the months of May, June and July of 2016 to each of the three credit reporting agency defendants.

46.   In her disputes to each of the credit reporting agencies, she advised that Ditech had admitted to her that they received her May, June and July of 2016 payments in a timely manner but placed them in an unapplied fund.

47.   Plaintiff advised that she had supporting documents and was willing to supply them to each credit reporting agency to assist in the removal of this false and inaccurate late payment history.

48.   Plaintiff accompanied at least one of her disputes to each of the credit reporting agencies with annotated banking records showing proof of the May, June and July 2016 payments.

49.   Plaintiff provided her cell phone number for each credit reporting agency to directly communicate with her.

50.   Not one of the three credit reporting agencies attempted to communicate with her about these disputed late payments either in writing or by cell phone.

51.   None of the three credit reporting agencies conducted a meaningful reinvestigation into her dispute.

52.  Plaintiff requested that each of the three credit reporting agencies correct the information and to remove the derogatory remarks.

53.  Plaintiff advised the credit reporting agencies in her dispute that she had adverse action taken against her by creditors due to this false information.

54.  As of the filing of this Complaint, the adverse tradelines reflecting late payments to Ditech from May, June and July of 2016 all remain in Plaintiff's credit file for each of the credit reporting agency defendants.

55.  Plaintiff has attempted to call Ditech on numerous occasions and even had one or more ditech employees acknowledge the error in her phone conversations, but it has not resulted in the correction of the false information.

56.  Each of the Defendants' actions have contributed separately to causing Plaintiff the loss of credit opportunities, tarnished her name and credit worthiness, and caused her to have to spend substantial time and energy to try to clear up the false adverse information contained in her credit file to no avail.

57.  Defendants' actions have collectively caused Shelton to suffer emotional distress, anxiety, frustration, embarrassment, humiliation, and annoyance.

## FACTS COMMON TO TRANS UNION ONLY

58.   At all times pertinent hereto, Trans Union was a "person" and a "consumer reporting agency" as those terms are defined by the FCRA, 15 U.S.C. § 1681a(b) and (f).

59.   At all times pertinent hereto, the credit reports discussed herein were "consumer reports" as that term is defined by the FCRA, 15 U.S.C. § 1681a(d).

60.   Pursuant to the FCRA, Trans Union must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

61.   Trans Union failed in this case to maintain procedures to assure the maximum possible accuracy of Plaintiff's personal credit files.

62.   Trans Union has been reporting derogatory and inaccurate information relating to Plaintiff and Plaintiff's credit histories to third parties [hereinafter the "inaccurate information"].

63.   The inaccurate information that Trans Union reported included, without limitation, that Plaintiff Shelton had been seriously delinquent and 90 or 120

days late in paying her mortgage in May, June and July of 2016.

64.     The inaccurate information negatively reflects upon the Plaintiff, Plaintiff's credit payment history, Plaintiff's financial responsibility as a borrower and Plaintiff's credit worthiness.

65.     Trans Union was reporting the inaccurate information through the issuance of false and inaccurate consumer credit reports that it has disseminated to various persons, entities and credit grantors, both known and unknown.

66.     Plaintiff has disputed the inaccurate information with Trans Union on one or more than one occasions, including enclosing copies of annotated bank statements detailing the inaccurate nature of the information reported by Trans Union, and by following Trans Union's established procedure for disputing consumer credit information.

67.     Despite at least two specific disputes made to Trans Union which contained supporting documentation proving the payments were made to Ditech, Trans Union  reaffirmed the late payments for May, June and July in both its March 31, 2018 and July 20, 2018 investigation results to her disputes.

68.     On each occasion where Plaintiff has disputed the inaccurate information with Trans Union, Trans Union reaffirmed the correctness of the false

information reporting in a tradeline in Shelton's credit file.

69. Despite Plaintiff's efforts, Trans Union never timely: 1) contacted Plaintiff to follow up on, verify and/or elicit more information about Plaintiff's disputes; 2) contacted any third parties that would have relevant information concerning Plaintiff's disputes; or 3) requested or obtained copies of any documents from Ditech.

70. Despite Plaintiff's efforts, Trans Union deliberately, willfully, intentionally, recklessly and/or negligently failed to perform a reasonable reinvestigation of the above-referenced disputes as required by the FCRA, failed to timely remove the inaccurate information and continued to report the derogatory inaccurate information about the Plaintiff, and continues to maintain the inaccurate tradeline up to the filing of this Complaint.

71. As a direct result of Trans Union's actions, Plaintiff has suffered actual damages in the form of economic loss, denial of credit, lost opportunity to receive credit, interference with normal and usual activities, damage to reputation, invasion of privacy, nuisance, credit defamation, emotional distress including anxiety, frustration, embarrassment and humiliation.

72. At all times pertinent hereto, Trans Union was acting by and through its

agents, servants and/or employees who were acting within the course and

scope of their agency or employment, and under the direct supervision and

control of Trans Union.

73.     At all times pertinent hereto, the conduct of Trans Union, as well as that of

its agents, servants and/or employees, was intentional, willful, reckless, and

in grossly negligent disregard for federal law and the rights of the Plaintiff

herein.

74.     Trans Union's failure to remove three May, June and July of 2016 late

payment on the Ditech account after Plaintiff's initial dispute indicates that

their procedures to assure maximum accuracy of the information they report

are flawed.

75.     Plaintiff has spent a significant amount of time during the last couple of

years trying to correct the false information which has been disclosed and

disseminated by Trans Union.


**FACTS COMMON TO EXPERIAN ONLY**

76.     At all times pertinent hereto, Experian was a "person" and a "consumer

reporting agency" as those terms are defined by the FCRA, 15 U.S.C. §

1681a(b) and (f).

77.   At all times pertinent hereto, the credit reports discussed herein were "consumer reports" as that term is defined by the FCRA, 15 U.S.C. § 1681a(d).

78.   Pursuant to the FCRA, Experian must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

79.   Experian failed in this case to maintain procedures to assure the maximum possible accuracy of Plaintiff's personal credit files.

80.   Experian has been reporting derogatory and inaccurate information relating to Plaintiff and Plaintiff's credit histories to third parties [hereinafter the "inaccurate information"].

81.   The inaccurate information that Experian reported included, without limitation, that Plaintiff Shelton had been seriously delinquent and 90 or 120 days late in paying her mortgage in May, June and July of 2016.

82.   The inaccurate information negatively reflects upon the Plaintiff, Plaintiff's credit payment history, Plaintiff's financial responsibility as a borrower and Plaintiff's credit worthiness.

83.   Experian was reporting the inaccurate information through the issuance of false and inaccurate consumer credit reports that it has disseminated to various persons, entities and credit grantors, both known and unknown.

84.   Plaintiff has disputed the inaccurate information with Experian on one or more than one occasions, including enclosing copies of annotated bank statements detailing the inaccurate nature of the information reported by Experian, and by following Experian's established procedure for disputing consumer credit information.

85.   Despite at least two specific disputes made to Experian which contained supporting documentation proving the payments were made to Ditech, Experian reaffirmed the late payments for May, June and Juyy in both its March 31, 2018 and July 20, 2018 investigation results to her disputes.

86.   On each occasion where Plaintiff has disputed the inaccurate information with Experian, Experian reaffirmed the correctness of the false information reporting in a tradeline in Shelton's credit file.

87.   Despite Plaintiff's efforts, Experian never timely: 1) contacted Plaintiff to follow up on, verify and/or elicit more information about Plaintiff's disputes; 2) contacted any third parties that would have relevant information

16

concerning Plaintiff's disputes; or 3) requested or obtained copies of any documents from Ditech.

88.     Despite Plaintiff's efforts, Experian deliberately, willfully, intentionally, recklessly and/or negligently failed to perform a reasonable reinvestigation of the above-referenced disputes as required by the FCRA, failed to timely remove the inaccurate information and continued to report the derogatory inaccurate information about the Plaintiff, and continues to maintain the inaccurate tradeline up to the filing of this Complaint.

89.     As a direct result of Experian's actions, Plaintiff has suffered actual damages in the form of economic loss, denial of credit, lost opportunity to receive credit, interference with normal and usual activities, damage to reputation, invasion of privacy, nuisance, credit defamation, emotional distress including anxiety, frustration, embarrassment and humiliation.

90.     At all times pertinent hereto, Experian was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Experian.

91.     At all times pertinent hereto, the conduct of Experian, as well as that of its

agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

92. Experian's failure to remove three May, June and July of 2016 late payment on the Ditech account after Plaintiff's initial dispute indicates that their procedures to assure maximum accuracy of the information they report are flawed.

93. Plaintiff has spent a significant amount of time during the last couple of years trying to correct the false information which has been disclosed and disseminated by Experian.

## FACTS COMMON TO EQUIFAX ONLY

94. At all times pertinent hereto, Equifax was a "person" and a "consumer reporting agency" as those terms are defined by the FCRA, 15 U.S.C. § 1681a(b) and (f).

95. At all times pertinent hereto, the credit reports discussed herein were "consumer reports" as that term is defined by the FCRA, 15 U.S.C. § 1681a(d).

96. Pursuant to the FCRA, Equifax must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

97. Equifax failed in this case to maintain procedures to assure the maximum possible accuracy of Plaintiff's personal credit files.

98. Equifax has been reporting derogatory and inaccurate information relating to Plaintiff and Plaintiff's credit histories to third parties [hereinafter the "inaccurate information"].

99. The inaccurate information that Equifax reported included, without limitation, that Plaintiff Shelton had been seriously delinquent and 90 or 120 days late in paying her mortgage in May, June and July of 2016.

100. The inaccurate information negatively reflects upon the Plaintiff, Plaintiff's credit payment history, Plaintiff's financial responsibility as a borrower and Plaintiff's credit worthiness.

101. Equifax was reporting the inaccurate information through the issuance of false and inaccurate consumer credit reports that it has disseminated to various persons, entities and credit grantors, both known and unknown.

102. Plaintiff has disputed the inaccurate information with Equifax on one or

more than one occasions, including enclosing copies of annotated bank statements detailing the inaccurate nature of the information reported by Equifax, and by following Equifax's established procedure for disputing consumer credit information.

103. Despite at least two specific disputes made to Equifax which contained supporting documentation proving the payments were made to Ditech, Equifax reaffirmed the late payments for May, June and July in both its April 2, 2018 and July 20, 2018 investigation results to her disputes.

104. On each occasion where Plaintiff has disputed the inaccurate information with Equifax, Equifax reaffirmed the correctness of the false information reporting in a tradeline in Shelton's credit file.

105. Despite Plaintiff's efforts, Equifax never timely: 1) contacted Plaintiff to follow up on, verify and/or elicit more information about Plaintiff's disputes; 2) contacted any third parties that would have relevant information concerning Plaintiff's disputes; or 3) requested or obtained copies of any documents from Ditech.

106. Despite Plaintiff's efforts, Equifax deliberately, willfully, intentionally, recklessly and/or negligently failed to perform a reasonable reinvestigation

of the above-referenced disputes as required by the FCRA, failed to timely remove the inaccurate information and continued to report the derogatory inaccurate information about the Plaintiff, and continues to maintain the inaccurate tradeline up to the filing of this Complaint.

107.  As a direct result of Equifax's actions, Plaintiff has suffered actual damages in the form of economic loss, denial of credit, lost opportunity to receive credit, interference with normal and usual activities, damage to reputation, invasion of privacy, nuisance, credit defamation, emotional distress including anxiety, frustration, embarrassment and humiliation.

108.  At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax.

109.  At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

110.  Equifax's failure to remove three May, June and July of 2016 late payment

on the Ditech account after Plaintiff's initial dispute indicates that their procedures to assure maximum accuracy of the information they report are flawed.

111. Plaintiff has spent a significant amount of time during the last couple of years trying to correct the false information which has been disclosed and disseminated by Equifax.

## CAUSES OF ACTION

## COUNT I: FAIR CREDIT REPORTING ACT – NEGLIGENT NONCOMPLIANCE

## (DITECH)

112. Ditech is a furnisher as defined by the FCRA.

113. The FCRA requires that furnishers of information, such as Ditech, upon receiving notice of a dispute from a credit reporting agency, "conduct an investigation with respect to all disputed information." The furnisher must review all relevant information provided to it by the credit reporting agency as part of the investigation. After conducting its investigation, the furnisher must inform the credit reporting agency of its results. If the furnisher finds

the information is incomplete or inaccurate, or cannot be verified, it must modify, delete, or permanently block the reporting of the disputed information." 15 U.S.C. § 1681s-2(b).

114.  The policies and procedures of Ditech do not insure compliance with this provision of the FCRA.

115.  Ditech negligently failed to comply with the requirements of the FCRA, including 15 U.S.C. § 1681s-2(b).

116.  As a result of Ditech's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damages to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681o(a)(1).

117.  Plaintiff requests attorney fees pursuant to 15 U.S.C. § 1681o(a)(2).

**COUNT II: FAIR CREDIT REPORTING ACT – WILLFUL**

**NONCOMPLIANCE**

**(DITECH)**

118.   Ditech willfully failed to comply with the requirements of the FCRA, including 15 U.S.C. § 1681s-2(b).

119.   As a result of Ditech's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681n(a)(1).

120.   Plaintiff is entitled to an award of punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. § 1681n(a)(2).

121.   Plaintiff requests attorney fees pursuant to 15 U.S.C. § 1681n(a)(3).

## COUNT III: FAIR CREDIT REPORTING ACT – NEGLIGENT NONCOMPLIANCE
### (TRANS UNION)

122.   The FCRA requires that credit reporting agencies (CRAs) such as Trans Union, in preparing a credit report, "follow reasonable procedures to assure

the maximum possible accuracy of the information" in the report. 15 U.S.C. § 1681e(b).

123. The FCRA requires that CRAs conduct a reasonable investigation of any information that is disputed by a consumer to determine if the information is accurate. CRAs must notify the source of the information of the dispute within five days. CRAs must provide the source with all relevant information received from the consumer. CRAs must review and consider all relevant information provided by the consumer in conducting the reinvestigation. CRAs must delete or modify information that is found to be inaccurate or incomplete, or that cannot be verified. CRAs must complete the reinvestigation within 30 days, or with 45 days if the dispute is based on a free annual credit report. CRAs must send a consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised as a result of the reinvestigation. 15 U.S.C. § 1681i(a).

124. The policies and procedures of Trans Union do not ensure compliance with these provisions of the FCRA.

125. Trans Union negligently failed to comply with the requirements of the FCRA.

126. As a result of Trans Union's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by a jury.

127. Plaintiff requests attorney's fees pursuant to 15 U.S.C. § 1681o(a).

## COUNT IV: FAIR CREDIT REPORTING ACT – WILLFUL NONCOMPLIANCE

## (TRANS UNION)

128. Trans Union willfully failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. § 1681e and i.

129. As a result of Trans Union's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff

seeks damages in an amount to be determined by a jury.

130. Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

131. Plaintiff requests attorney fess pursuant to 15 U.S.C. § 1681n(a).

## COUNT V: FAIR CREDIT REPORTING ACT – NEGLIGENT NONCOMPLIANCE

### (EXPERIAN)

132. The FCRA requires that credit reporting agencies (CRAs) such as Experian, in preparing a credit report, "follow reasonable procedures to assure the maximum possible accuracy of the information" in the report. 15 U.S.C. § 1681e(b).

133. The FCRA requires that CRAs conduct a reasonable investigation of any information that is disputed by a consumer to determine if the information is accurate. CRAs must notify the source of the information of the dispute within five days. CRAs must provide the source with all relevant information received from the consumer. CRAs must review and consider all relevant information provided by the consumer in conducting the

reinvestigation. CRAs must delete or modify information that is found to be inaccurate or incomplete, or that cannot be verified. CRAs must complete the reinvestigation within 30 days, or with 45 days if the dispute is based on a free annual credit report. CRAs must send a consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised as a result of the reinvestigation. 15 U.S.C. § 1681i(a).

134.   The policies and procedures of Experian do not ensure compliance with these provisions of the FCRA.

135.   Experian negligently failed to comply with the requirements of the FCRA.

136.   As a result of Experian's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by a jury.

137.   Plaintiff requests attorney's fees pursuant to 15 U.S.C. § 1681o(a).

**COUNT VI: FAIR CREDIT REPORTING ACT – WILLFUL**

28

## NONCOMPLIANCE

## (EXPERIAN)

138. Experian willfully failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. § 1681e and i.

139. As a result of Experian's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by a jury.

140. Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

141. Plaintiff requests attorney fess pursuant to 15 U.S.C. § 1681n(a).

## COUNT VII: FAIR CREDIT REPORTING ACT – NEGLIGENT

## NONCOMPLIANCE

## (EQUIFAX)

142. The FCRA requires that credit reporting agencies (CRAs) such as Equifax, in preparing a credit report, "follow reasonable procedures to assure the maximum possible accuracy of the information" in the report. 15 U.S.C. § 1681e(b).

143. The FCRA requires that CRAs conduct a reasonable investigation of any information that is disputed by a consumer to determine if the information is accurate. CRAs must notify the source of the information of the dispute within five days. CRAs must provide the source with all relevant information received from the consumer. CRAs must review and consider all relevant information provided by the consumer in conducting the reinvestigation. CRAs must delete or modify information that is found to be inaccurate or incomplete, or that cannot be verified. CRAs must complete the reinvestigation within 30 days, or with 45 days if the dispute is based on a free annual credit report. CRAs must send a consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised as a result of the reinvestigation. 15 U.S.C. § 1681i(a).

144. The policies and procedures of Equifax do not ensure compliance with these provisions of the FCRA.

145. Equifax negligently failed to comply with the requirements of the FCRA.

146. As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by a jury.

147. Plaintiff requests attorney's fees pursuant to 15 U.S.C. § 1681o(a).

## COUNT VIII: FAIR CREDIT REPORTING ACT – WILLFUL NONCOMPLIANCE
### (EQUIFAX)

148. Equifax willfully failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. § 1681e and i.

149. As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and

interference with Plaintiff's normal and usual activities for which Plaintiff

seeks damages in an amount to be determined by a jury.

150.  Plaintiff is entitled to punitive damages in an amount to be determined by

the jury.

151.  Plaintiff requests attorney fess pursuant to 15 U.S.C. § 1681n(a).


## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that judgment be entered against

Defendants and in favor of him, as follows:

On Count I for Relief:

1.  Actual damages to be determined by the jury; and

2.  Attorney fees.

On Count II for Relief:

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury; and

3. Attorney fees.

On Count III for Relief:

1. Actual damages to be determined by the jury; and

2. Attorney fees.

On Count IV for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and

3. Attorney fees.

On Count V for Relief:

1. Actual damages to be determined by the jury; and

2. Attorney fees.

On Count VI for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and

3. Attorney fees.

On Count VII for Relief:

1. Actual damages to be determined by the jury; and

2. Attorney fees.

On Count VIII for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and

3. Attorney fees.


Respectfully submitted,

SKAAR & FEAGLE, LLP

By:  /s/ James M. Feagle
James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
Cliff R. Dorsen
Georgia Bar No. 149254
cdorsen@skaarandfeagle.com
2374 Main Street, Suite B
Tucker, GA 30084
Telephone:  (404) 373-1970
Facsimile:   (404) 601-1855

Kris Skaar
Georgia Bar No. 649610
kskaar@skaarandfeagle.com
Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
133 Mirramont Lake Drive
Woodstock, GA 30189
Telephone:  (770) 427-5600
Facsimile:   (404) 601-1855

34

*Attorneys for Plaintiff Terri A. Shelton*